[Civ. No. 7752.   Third Dist.   May 5, 1950.]

STATE EMPLOYEES' RETIREMENT SYSTEM, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and VIRGINIA LUND, Respondents.

Fred N. Howser, Attorney General, and Lenore D. Underwood, Deputy Attorney General, for Petitioner.

Donald Gallagher and Royle A. Carter, Amici Curiae on behalf of Petitioner.

T. Groezinger and George C. Faulkner for Respondents.

SPARKS, J. pro tem.—This is a proceeding upon writ of review of a death benefit award made by the Industrial Accident Commission in favor of the widow and three minor children of Karl Lund, deceased. Petitioner State Employees' Retirement System seeks an annulment of the award, on the grounds that respondent commission had acted without and in

excess of its powers and that the evidence was insufficient to justify the findings of fact.

The decedent, Karl Lund, was employed as a game warden by the Department of Natural Resources. As such officer his duties were to enforce the provisions of the Fish and Game Code, and in so doing he had no regular or prescribed hours of duty. At times he was required to go on night patrol and to station himself in isolated areas where infractions of the Fish and Game Code might occur. An automobile equipped with a two-way radio was furnished him by his employer. The car was also so equipped that it might be converted into a bed, and it was permissible for him, while on night patrol, to sleep in the car.

On June 13, 1948, the deceased went on duty at 10 o'clock in the morning. According to the entries in his diary he went on patrol to "Napa State Hospital, Soscal, thence to Cuttings Wharf, Brown's Valley to Oakville night parol Trinity Road." At 2:58 p. m. on the 13th Lund reported by radio to the sheriff's office that he was in service. No further reports were received from him. On the 14th, Lund not having returned or checked in by radio, a search was made for him. At a point 16 or 18 miles from Napa, the car furnished Lund by the state was found. It was parked about 20 feet off a side road, facing into a hill. This side road was a slight distance from the Oakville-Trinity Mountain road. It was in "wild" country and where, according to Lund's superior officer, apprehensions were made of violators hunting deer at night with spotlights. About 12 feet to the rear of the state car there was another automobile parked. Investigation revealed that the interior of the state car had been converted into a bed, and on this bed were found the dead bodies of Karl Lund and of a woman, Chelsea Miami. The bodies were clad respectively only in shorts and panties and were partially covered by a blanket. The ignition switch, radio and heater of the car were all turned on and the gasoline tank was empty. All of the doors and windows were closed with the exception of one side wing-window which was slightly open. Lund's clothes, boots and gun were in the back of the car and under the seat. The deaths were attributed by the coroner to carbon monoxide poisoning, the vapor of which apparently had infiltrated into the car from the running motor and been inhaled while the deceased were lying on the bed. Approximate time of death was fixed as between 1 and 3 a. m. of June 14th.

Herminia Miami, the sister of Chelsea, testified that Chelsea had received a telephone call at their home from Lund shortly before 9 p. m.; that he had asked Chelsea to meet him, and within a few minutes after receiving the call Chelsea had changed to slacks and left in her own car.

There was no rule or regulation of the department by whom Lund was employed which prohibited any of the game wardens, while on duty, from having company.

Upon the facts adduced at the hearing, summary of which has been given above, respondent Industrial Accident Commission made its finding that Karl Lund had sustained injury occurring in the course of and arising out of employment proximately causing his death from inhalation of carbon monoxide fumes. A petition for rehearing was granted by respondent commission, and after a further hearing respondent affirmed its findings of fact theretofore made.

Petitioner contends that these findings are irrational for the reason that the evidence shows that deceased met his death while on a personal adventure, and that in so doing he had deviated from the scope of his employment and from his duties as fish and game warden.

In reviewing the evidence we are not permitted to substitute our views for those of the commission and annul an award unless there is no substantial evidence to support the findings and order. (*Riskin* v. *Industrial Acc. Com.*, 23 Cal. 2d 248, 254 [144 P.2d 16].) On the contrary, we are required to indulge all reasonable inferences which may be drawn legitimately from the facts in order to support the findings of the commission, and in doing so all that is required is reasonable probability; not absolute certainty. (*Pacific Employers Ins. Co.* v. *Industrial Acc. Com.*, 19 Cal.2d 622 [122 P.2d 570, 141 A.L.R. 798] ; *Pacific Indem. Co.* v. *Industrial Acc. Com.*, 28 Cal. 2d 329, 339 [170 P.2d 18].) It is the duty of a reviewing court to search the record to discover whether the evidence is reasonably susceptible of the inferences drawn by the commission in support of its conclusion, and upon favorable discovery to affirm the award. (*Coborn* v. *Industrial Acc. Com.*, 31 Cal.2d 713 [192 P.2d 959].) Neither may the award be annulled because there are two conclusions which fairly may be drawn from the evidence, both of which are reasonable, the one sustaining and the other opposing the right to compensation. (*G. L. Eastman Co.* v. *Industrial Acc. Com.*, 186 Cal. 587 [200 P. 17] ; *Western Pac. R. R. Co.* v. *Industrial Acc. Com.*, 193 Cal. 413 [224 P. 754] ; *Hartford Acc. & Indem. Co.* v. *In-*

*dustrial Acc. Com.*, 202 Cal. 688 [262 P. 309, 58 A.L.R. 1392] ; *Bethlehem Steel Co.* v. *Industrial Acc. Com.*, 70 Cal.App.2d 382 [161 P.2d 59].) Nor may an award be rejected solely on the basis of moral or ethical considerations.

██ Measured by these rules we note in reviewing the record the following facts and circumstances in support of respondent's findings: That Lund, as a fish and game warden, had no regular or fixed hours of employment; that frequently he did patrol duty at night for the purpose of intercepting violators of the fish and game laws; that the last entry in his diary sets forth his itinerary for the 13th and concludes, ''to Oakville night patrol Trinity Road''; that his diary also discloses that he had been on night patrol on the preceding evening. His death having occurred between 1 and 3 a. m does not therefore justify any conclusion that it happened outside of the hours of his employment. As to the place of his death, the evidence shows that he had stationed himself in a territory which was under surveillance for the illegal spotlight killing of deer. The two-way radio with which the car was equipped was turned on so that Lund could not only have received messages from headquarters, but if need be could have sent them. While on such duty he was not only permitted to, but it was contemplated that he could convert the car into a bed (for it was so equipped), and that he might retire thereon or sleep. There was no rule that forbade his having company while on duty. The testimony of Captain Shea in this regard is as follows:

''[Mr. FAULKNER] Q. . . . Now, would you—is there any order or rule or regulation of the department that prohibits you, while you're sitting there in your car or stationed in your car or in bed in your car, from talking to anybody that comes along?

A. Definitely not.

Q. Is there any rule or regulation prohibiting that person from getting into the car and sitting down with you, having a smoke or a chat?

A. No, there isn't.

Q. Is there any rule or regulation of the department that prohibits you or any of the men, any of the game wardens, from—while on duty—from talking or entertaining or enjoying the company of other people?

A. No, there's no regulation to that effect.

Q. No rule against it?

A. No rule against it.''

And finally, his death was occasioned from carbon monoxide poisoning from the use of equipment furnished him by his employer.

From this and other facts and circumstances in the record, we cannot say there was not substantial evidence to support the findings of the commission, or that the findings were irrational. In doing so we are well aware of the contrary inferences which might have been drawn from the same set of facts. The secluded spot in a remote area could have been selected by Lund for its advantages as a rendezvous in which to conduct an illicit love affair. The manner in which the cars were parked, the state of partial dishabille in which the bodies were found, the fact that Lund had divested himself of his uniform and placed his gun and boots underneath the seat, all are circumstances from which the trier of facts might have reasonably concluded that he had either abandoned or deviated from his duty. However, as stated above, it is not our province to resolve these facts or to substitute our own views for those of the commission. Lund, while acting in the scope of his employment, was permitted to drive to isolated spots where game violators might be found. It was a matter of discretion with him whether or not at such times he converted the car into a bed and slept. In so doing he was acting within the course of his employment. (*California C. I. Exchange* v. *Industrial Acc. Com.*, 5 Cal.2d 185 [53 P.2d 758].) There was no rule which forbade him from having company while on duty, and the presence of a woman in the car with him does not necessarily compel a conclusion that he had thereby either abandoned his employment or deviated therefrom.

There being a choice between two inferences reasonably deducible from the evidence, we cannot say that the commission acted without or in excess of its powers or that its findings of fact were unreasonable.

The award is affirmed.

Adams, P. J., and Peek, J., concurred.